# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1436 | **DATE** | 5/12/2003 |
| **CASE TITLE** | M.S. Distributing Co., et al. vs. Web Records, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiffs' motion for summary judgment [doc. #77] is GRANTED against Ms. Berns on Count II in the amount of $438,611.80 (excluding interest, fees and costs), without any setoff to be applied by Ms. Berns. Plaintiffs' motion to exclude [doc. #94] is denied as moot; and defendant's motion to strike the declaration of Ron Litwin [doc. # 87] is also denied as moot. Status hearing is set for 05/22/03 at 9:00 a.m. to address any remaining issues concerning interest, fees and costs. The parties are directed to discuss settlement prior to the status hearing.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | number of notices | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | MAY 13 2003 | | 95 |
| ✓ | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 5/12/2003 | | |
| | | | date mailed notice | | |

U.S. DISTRICT COURT

03 MAY 12 PM 3: 17

JJK courtroom deputy's initials

Date/time received in central Clerk's Office

JJK mailing deputy initials

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

M.S. DISTRIBUTING CO., a corporation, )
and CONGRESS FINANCIAL CORP., a )
corporation, )
                     )
          Plaintiffs, )
                     )
vs. )
                     )
WEB RECORDS, INC., a corporation, )
ILENE BERNS, and BRIAN JACKSON, )
                     )
          Defendants. )

No. 00 C 1436

Magistrate Judge Schenkier

DOCKETED

MAY 1 3 2003

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

On March 21, 2001, the Court granted a default judgment for the plaintiffs, M.S. Distributing

Co. and Congress Financial Corp. ("M.S. Distributing"), on Count I of the Complaint, awarding

damages for breach of contract against the defendant, Web Records, Inc. ("Web"), in the amount of

$650,311.79 (doc. # 40-41). On June 13, 2001, the Court granted partial summary judgment in favor

of M.S. Distributing on Count II, which sought judgment against defendants Ilene Berns and Brian

Jackson, the owners of Web: the Court held that Mr. Jackson and Ms. Berns signed the guarantee

in their personal capacities; that M.S. Distributing was not required to exhaust remedies against Web

in order to recover on the guarantee; and that the amount advanced by M.S. Distributing that had not

been recouped from Web and subject to the guarantee was $438,680.11 (doc. # 45: 06/13/01 Mem.

Op. at 20-21). The Court denied summary judgment to M.S. Distributing for that amount, however,

on the ground that "Mr. Jackson and Ms. Berns may assert as setoffs to the plaintiff's claim defenses

_____

[1]By the consent of the parties and pursuant to 28 U.S.C. § 636(c), on March 8, 2001, the case was assigned to
this Court for all proceedings, including the entry of final judgment (doc. ## 37-38).

95

that Web could have asserted, and that the disputed factual record precludes a ruling on summary judgment as to whether those defenses are meritorious" (*Id.*, at 21).

Now pending before the Court is M.S. Distributing's second summary judgment motion, this one seeking to overrule the setoff claims and to obtain a judgment in the amount of $438,680.11 on the guarantee (doc. # 77). Prior to the filing of this motion, on June 7, 2002, M.S. Distributing and Mr. Jackson stipulated to the entry of judgment against Mr. Jackson on Count II (doc. # 67). Thus, the pending summary judgment motion is directed solely to Ms. Berns, and presents one issue: whether Ms. Berns' factual submissions can create a genuine and material question of fact to support a setoff claim (or affirmative defense) to the $438,680.11 that otherwise would be due under the guarantee. For the reasons discussed below, the Court finds that Ms. Berns has not shown a triable issue on her setoff claims, and therefore enters summary judgment in favor of M.S. Distributing and against Ms. Berns on Count II in the amount of $438,680.11.

## I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988).

In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d

656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). "A Court's obligation to draw all reasonable inferences in favor of a nonmoving party, however, does not require that Court to stretch existing evidence to reach conclusions or bolster arguments it could not otherwise support." *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 860 (7th Cir. 2001). Mere conclusory assertions, unsupported by specific facts, are not sufficient to defeat a proper motion for summary judgment. *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998); *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985). ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact").

## II.

The following facts are material and without genuine dispute.

### A.     The Parties.

M.S. Distributing is an Illinois corporation with its principal place of business in Illinois (Pl.'s Rule 56.1(a)(3) Statement ("Pl.'s Facts"), ¶ 2). Until January 2000, plaintiff M.S. Distributing was in the business of distributing phonographic records and tapes (*Id.*, ¶¶ 16, 20-21). Plaintiff, Congress Financial Corporation, is a Delaware corporation with its principal place of business in New York. At all relevant times, the defendant, Web, a Tennessee corporation with its principal place of business in Tennessee, was engaged in the business of acquiring and producing master recordings and manufacturing phonographic records and tapes (*Id.*, ¶ 1). Defendants Berns and Jackson, once married, are now divorced citizens of Florida (although Ms. Berns' personal residence is in California) (*Id.*, ¶¶ 1, 12, 24). Ms. Berns and Mr. Jackson both were shareholders of Web; in

addition, Mr. Jackson served as president of Web, and Ms. Berns served as Web's chairperson and an officer of the corporation (*Id.*, ¶ 8). After Web's inception in 1998, Ms. Berns named Glenn Palmer as Web's chief financial officer and vice president of sales; Mr. Palmer also was Web's sole remaining shareholder (*Id.*, ¶ 9).

**B.      Web Records History and Ilene Burns' Involvement In It.**

Ms. Berns began her career in the music business in 1967, following the death of her first husband. Upon his death, she operated the record label which he had founded – Bang Records. In 1979 or 1980, Berns sold Bang Records to CBS Records (now Sony) (Pl.'s Facts, ¶ 23). Ms. Berns, however, was "retained by CBS Records for purposes of running Bang Records for approximately three years following her sale of Bang Records to CBS Records" (Def.'s Resp. ¶ 25). With the exception of her retainer agreement with CBS after the sale of Bang Records, Ms. Berns was absent from the record label and/or record production parts of the industry from the early 1980's until 1998 (Pl.'s Facts, ¶ 27).

Between 1980 and 1998, Ms. Berns owned three music publishing companies and spent five years as the owner of a radio station in Albany, Georgia (Def.'s Resp. ¶ 25). Ms. Berns' publishing companies held the rights to prominent songs authored by her late husband (including "Twist and Shout"; "Piece of My Heart"; and "Hang On Sloopy"). Without having to do much production, selling or promotion, Ms. Berns' publishing companies received royalties from air play and performances of those songs, as well as income from negotiating the use of these songs in movies and commercials (Pl.'s Facts, ¶ 26).

Several years after Sony bought the Bang Records label from Ms. Berns, Sony substantially stopped using the name "Bang Records." Thus, when Ms. Berns opened Web in 1998, she obtained

4

Sony's permission for Web to use the name "Bang II Records" (Pl.'s Facts, ¶ 30). Other than Ms. Berns, none of Web's shareholders or officers had experience in the music production industry (*Id.*, ¶ 29).

## C.    M.S. Distributing's History.

Before its demise between late 1999 and early 2000, M.S. Distributing had been an independent record distributor for almost 50 years (Pl.'s Facts, ¶¶ 15-16). M.S. Distributing's two corporate principals were Anthony Dalesandro and John Salstone (*Id.*, ¶ 17). In May 1999, Messrs. Dalesandro and Salstone sold the bulk of their stock to an outside media company. However, Messrs. Dalesandro and Salstone remained with M.S. Distributing to continue supervising M.S. Distributing's distribution of audio and video products (*Id.*, at ¶ 18). In late August 1999, Messrs. Salstone and Dalesandro had a falling out with the new owners of M.S. Distributing. As a result, they took an involuntary leave of absence until early October 1999 (*Id.*, at ¶ 19).

In October 1999, Messrs. Salstone and Dalesandro re-purchased the company's stock in an effort to save M.S. Distributing from going out of business (Pl.'s Facts, ¶ 21). During the period between August and October 1999, several record labels severed their relationships with M.S. Distributing (*Id.*, ¶ 20). After concluding that the loss of the key record labels had irreparably wounded the audio division, M.S. Distributing laid off its audio employees and ceased distributing audio products in mid-October 1999 (*Id.*, at ¶ 21). As of that date, M.S. Distributing was substantially out of the audio distribution phase of its business (*Id.*, at ¶ 22). However, to the extent that retailers continued to request audio products, M.S. Distributing continued to ship them to retailers until about January 2000 (*Id.*, at ¶ 21).

**D.    The M.S. Distributing-Web Distribution Agreement.**

On or about April 6, 1998, Web and M.S. Distributing entered into a Distribution Agreement (Pl.'s Facts, ¶ 37 and Ex. A thereto). The agreement that M.S. Distributing drafted and presented to Web was a "standard distribution agreement form that [M.S. Distributing] signed with quite a few labels" (Def.'s Add'l Facts ("Def.'s Facts") ¶ 5). However, Web had a lawyer review the Distribution Agreement before it was signed (*see* 6/13/01 Mem. Op. at 6), and Web negotiated certain changes to the standard form agreement (Def.'s Facts ¶¶ 9, 14; Pl.'s Reply to Def.'s Facts ("Pl.'s Reply") ¶¶ 9, 14).

Pursuant to the Distribution Agreement, M.S. Distributing committed to act as Web's exclusive distributor in the United States (Pl.'s Facts, Ex. A, ¶ 2). M.S. Distributing was required to buy records, tapes and compact discs (which for convenience we refer to collectively as "records") from Web, at prices established in the Distribution Agreement, and then to distribute those items to sales outlets (*Id.*, ¶ 15 and Ex. A, ¶¶ 4-7). In addition, under the Distribution Agreement, M.S. Distributing was required to make certain other payments to Web. *First*, the Distribution Agreement provided that upon execution of the Agreement, M.S. Distributing would advance to Web the sum of $250,000; sixty days after receiving Web's initial master recording, M.S. Distributing was required to advance to Web an additional sum of not less than $250,000 – either as an additional advance or as monies due under the Distribution Agreement for records purchased by M.S. Distributing for distribution to sales outlets) (*Id.*, ¶¶ 65-69, and Ex. A, ¶ 8(b); Def.'s Facts ¶ 25; Pl.'s Reply ¶ 25). *Second*, the Distribution Agreement required M.S. Distributing to advance funds to pay for Web's "duplication costs," which were the costs Web incurred in having a third-party multiply (or "press") a single recording into thousands of copies for retail sale (Def.'s Facts ¶ 25 and Pl.'s Ex.

A, ¶ 8(b)). Ms. Berns specifically negotiated this provision, which was not present in many of M.S. Distributing's agreements with other labels (Def.'s Facts, ¶ 9). The total amount of the advance "was one of the most [M.S. Distributing] had ever advanced," based in large part upon Mr. Salstone's knowledge of Ms. Berns' abilities and Web's plans for using the funds (Def.'s Facts, ¶ 12).

Under the Distribution Agreement, the sales procedure was that M.S. Distributing would buy the records from Web (Pl.'s Facts, ¶ 40), and would then distribute the records directly to retailers, or to a retailer's independent buyer or supplier for distribution to retailers (*Id.*, at ¶ 41). The retailers would then sell the records to the consumer (*Id.*, at ¶ 41). At the time Ms. Berns signed the Distribution Agreement, she knew that, in the record industry, retailers had an automatic right to return unsold records to a distributor (such as M.S. Distributing) for credit, refund, or exchange (*Id.*, at ¶ 46). The distributor had a similar right to return to the record label not only those records that the retailer returned, but also those records that the distributor was unable to place with the retailers (*Id.*, at ¶ 47). M.S. Distributing's right to return records to Web appears in paragraph 9 of the Distribution Agreement – which gave M.S. Distributing the right to return to Web "for credit or refund, at Distributor's option, one hundred percent (100%) of all Records." In addition, paragraph 11(a) of the Distribution Agreement states that: "[u]pon termination of this Agreement for any reason, Label [Web] will accept returns of all Records, as provided in paragraph 9 above, for credit or refund at Distributor's [M.S. Distributing's] option, and will pay Distributor for any unrecouped advances and credit balances" (*Id.*, at ¶ 50 (citing Pl.'s Ex. A)). The parties agree that the provision meant that "Web would owe M.S. Distributing for any product returns falling within the scope of M.S. Distributing's right to return records to Web" (*Id.*, at 68).

The Distribution Agreement provided that upon Web's authorization of promotional or advertising expenses, M.S. Distributing would make those funds available to retailers. Specifically, the Distribution Agreement provided that: "[o]n each of [Web's] first four releases, if and to the extent authorized by [Web], [M.S. Distributing] will authorize retail customers to expend a minimum of $50,000 for advertising, for which [M.S. Distributing] shall give to or reimburse its customer and [Web] shall give credit to [M.S. Distributing] or reimburse [M.S. Distributing] if such credit leaves [M.S. Distributing] with a credit balance" (Pl.'s Facts, Ex. A, ¶ 15). In other words, "Web would owe M.S. Distributing for various promotion expenses initially incurred by retailers, and then paid for by M.S. Distributing" (Id., at ¶ 68). Moreover, the advertising provision only required M.S. Distributing to devote such sums (to be repaid by Web) if Web authorized those expenditures before they are made (Pl.'s Reply, ¶ 14). The Distribution Agreement provided that Web would fully repay M.S. Distributing for the advances and payment of duplication costs, pursuant to a specified formula (Id., ¶ 66 and Ex. A, ¶ 8(a)(b); Def.'s Facts, ¶¶ 11-12; Pl.'s Resp. ¶¶ 11-12). M.S. Distributing would have the right to apply monies due to Web as payment for records to recoup all duplication costs, and then seventy percent of the remaining amounts due to Web as payment for records to recoup advances (6/13/01 Mem. Op. at 5 (citing Ex. A, ¶ 8(a)(b)). Web was prohibited from terminating the Distribution Agreement at any time prior to full repayment of advances and any other indebtedness, excluding duplication costs (Def.'s Facts, ¶ 17).

The Distribution Agreement provided for the possibility that, under this repayment formula, M.S. Distributing would not be able to fully recoup from Web the advances and duplication payments (Def.'s Facts, ¶ 17)). The Distribution Agreement thus provided that "Ilene Berns and Brian Jackson shall jointly and severely guarantee the repayment of any portion of such advance and

duplication payments not otherwise recouped by Distributor [M.S. Distributing], and they are signing this Distribution Agreement solely to evidence this guarantee" (*Id.*, Ex. A, ¶ 8(b)(2)). The Distribution Agreement further provided that each party would indemnify the other "against any damages and costs, including lawyer and litigation costs, resulting from either party's violation of its representations, warranties or obligations hereunder" (*Id.*, Ex. A, ¶ 16).

The parties agree that because M.S. Distributing was the exclusive distributor for Web's products, Web could not make direct sales either to retail record stores or to consumers (Def.'s Facts, ¶ 16). As the exclusive distributor, M.S. Distributing was obligated to "solicit record stores in the Territory which satisf[ies] Distributor's usual and customary terms to insure that the Records of Label are available in the Territory" (Def.'s Facts, ¶ 18). M.S. Distributing understood that it was required to use its best efforts to distribute Web's products (Def.'s Facts, ¶ 19). As part of its efforts, M.S. Distributing understood its obligations to mean that it would make Web's products available "in" (not "throughout") the United States to customers of M.S. Distributing and that it was responsible for keeping Web "generally" informed of its distribution activities (Def.'s Facts, ¶¶ 20-21; Pl.'s Reply ¶¶ 20-21).

**E.    Chronology Of Events Occurring Under The Distribution Agreement.**

In June 1998, Web released its first album, the country and western album "All I Ever Wanted" by Monty Holmes (Pl.'s Facts, ¶ 31). Although Mr. Holmes was an established songwriter, he had never before acted as a recording artist (*Id.*, ¶ 32). In mid-July 1998, Web released its second album, the urban/rap/hip-hop album "The Vinyl Room" by the group Sleepy's Theme (*Id.*, ¶ 33). The lead performer of the group was Patrick "Sleepy" Brown. Although Sleepy Brown previously had been part of a record production crew, he had never been a recording artist. This album was

Sleepy Brown's debut as an artist (*Id.*, ¶ 34). Web also leased from Sony the rights to a comedy album entitled "This Honkey's Nuts" by Don Imus. That album had been originally released in 1974. In late 1998 or early 1999, Web re-released this comedy album (*Id.*, ¶ 35).

The terms of the Distribution Agreement obligated M.S. Distributing to disburse its initial advance of $250,000 to Web immediately after the agreement was signed in April 1998 – which it did (Def.'s Facts ¶¶ 25-26; Pl.'s Reply ¶ 26). The second payment of $250,000 was to be made, under the terms of the Distribution Agreement, "sixty (60) days after delivery of Label's initial master recording" – which turned out to be the album by Monty Holmes (Pl.'s Reply ¶ 26 (citing Def.'s Ex. G, ¶ 8(b)). In response to the requests to admit served upon her, Ms. Berns admitted that Web received two checks, totaling $250,377.78, in August 1998 (which was within the sixty day window after release of the Monty Holmes album), and that these funds were "payment for invoiced product" (Pl.'s Reply, ¶ 56; and Berns Response to Pl.'s First Requests to Admit, ¶¶ 1-2). The Distribution Agreement only required M.S. Distributing to make the second $250,000 payment as "monies due under the Agreement" *or* "as an Additional Advance" (Pl.'s Resp., ¶ 25).[2]

As for advertising money, it is undisputed that, prior to the 1999 termination of the Distribution Agreement, M.S. Distributing expended approximately $43,100 on advertising the

---

[2] Ms. Berns now seeks to dispute that this second payment was received, citing to subsequent deposition testimony by Mr. Palmer that the second advance was not made, "to my knowledge" (Def.'s Fact, Ex. E., at 19). Mr. Palmer's testimony does not contradict Ms. Berns' admission, because he did not testify as to whether a second $250,000 payment was received as "monies due under the Agreement" in payment for records, as the Distribution Agreement allowed, rather than as an "advance." But, even if Mr. Palmer had contradicted Ms. Berns' admission, that would be insufficient here to create a genuine dispute of material fact. Ms. Berns' Rule 36 admission is binding; what she admitted there "is conclusively established unless the court on motion permits withdrawal or amendment of the admission." Fed. R. Civ. P. 36(a); *see also Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1059 (7th Cir. 2000). While Rule 36(b) provides a procedure for withdrawing admissions, *Kalis, id.; United States v. Kasuboski*, 834 F.2d 1345, 1349 (7th 1987), Ms. Berns never resorted to that procedure. Accordingly, we treat as undisputed that in August 1998, M.S. Distributing made a payment of $250,377.78 as payment for invoiced product.

Monty Holmes album and $7,200 on advertising the Sleepy's Theme album (Def.'s Facts ¶ 62). There is no evidence that Web authorized any advertising funds on other records. There also is no evidence that retailers sought additional advertising funds for those records, or that M.S. Distributing failed to provide any advertising funds that retailers requested.

During the course of the contract with Web, M.S. Distributing distributed Web's records directly to retailers, or to the retailer's independent buyer, or to one-stops. Some of the larger retailers (*e.g.*, Wal-Mart and K-Mart) do not buy records directly from the distributors, but rather have an independent buyer obtain those records for them. M.S. Distributing was able to distribute (to scores of chains, buyers for chains, and/or one-stops) about 88 percent of the records for Monty Holmes' album "All I Ever Wanted" (Pl. 's Facts, ¶ 53) and more than 75 percent of the records for Sleepy's Theme's album "The Vinyl Room" (*Id.,* ¶ 54). Web also manufactured some recordings of single songs performed by Monty Holmes or Sleepy's Theme. Labels may use compact discs of single songs as a loss leader to promote an album. Web often gave singles away for free, or sold them below cost (*Id.,* ¶ 55).

Although the Distribution Agreement does not expressly mention any obligation by Web to promote its own products (Pl.'s Facts, ¶ 39; Def.'s Facts, ¶ 23), Web's president, Brian Jackson, testified that Web "probably had such an obligation to its artists" by referring to "trade usage in the record label industry" (Def.'s Resp. ¶ 39). And, neither Ms. Berns nor Mr. Jackson disputes that "M.S. Distributing expected its labels to promote their records by securing air play on radio stations, producing music videos and securing air time on appropriate music television stations, and formulating a market budget and plan to present to M.S. Distributing so that M.S. Distributing or, in some circumstances, the label could in turn try to get stores to run the ads or programs" (Def.'s

11

Facts, ¶ 24). Ms. Berns does not dispute that the albums by "Sleepy" and Monty Holmes "lacked good air play in the largest markets such as New York; Los Angeles; Chicago; Houston; and the San Francisco Bay area" (Pl.'s Facts, ¶ 60).

The two records produced by Web failed to achieve commercial success – at least, as measured by retail sales. While Web complains that M.S. Distributing failed to place all of the available Holmes and Brown records in stores, it is undisputed that consumers failed to buy all of the ones that were placed in retail outlets by M.S. Distributing. Stores returned to M.S. Distributing two-thirds of the Holmes records, and thirty-five percent of the Brown records (Pl.'s Facts ¶ 58; *cf.* Def.'s Resp., ¶ 58 (not specifically disputing these numbers)).

In contrast to Web having M.S. Distributing do exclusive distributing of the Holmes and Brown records, Web did some direct selling of the Imus record (Pl.'s Facts, ¶ 35). As for the Imus record, sales efforts were torpedoed by Mr. Imus himself. When Mr. Imus learned of the re-release, he publicly requested that people not buy his 25-year old comedy album (*Id.,* ¶ 36).

With the level of sales being disappointing, and with M.S. Distributing being unwilling to advance more funds, Web's financial condition continued to decline. Web stopped spending money on promoting its artists and records in the first quarter of 1999 (Pl.'s Facts, ¶ 14). "Sometime" in 1999 – precisely when is unclear, but before Web went out of business in June 1999 – Brian Jackson contacted Anthony Dalesandro of M.S. Distributing to "inform him that while Web still possessed substantial quantities of product, Web had exhausted its funds for touring and promotions and was in need of an additional advance" (Def.'s Facts, ¶ 59; Pl.'s Resp., ¶ 59). Ms. Berns has offered no evidence that M.S. Distributing had a contractual obligation to provide the requested advance (since she has admitted that M.S. Distribution by then already had made the initial $250,000 advance in

April 1995 and another $250,000 payment in August 1998 (Pl.'s Reply, ¶ 56)). M.S. Distributing refused to pay Web the requested additional advance (Def.'s Facts, ¶ 60), and instead elected to treat the Distribution Agreement as terminated (*Id.*).

Ms. Berns laid Mr. Palmer off in late May or early June 1999, and Web's final payroll, as shown by the Web check ledger and/or disbursements journal, was on June 15, 1999 (Pl.'s Facts at ¶ 14). "Thus, by June[]1999, Web was functionally out of business" (Pl.'s Facts,¶ 22).

As indicated, M.S. Distributing began its downward descent in or around May 1999 (Pl.'s Facts, ¶ 18), when Messrs. Dalesandro and Salstone sold the bulk of their stock to an outside media company (*Id.*). By late August 1999, Messrs. Dalesandro and Salstone had left M.S. Distributing on an involuntary leave, and when they returned to repurchase their stock in October 1999, it was too late to save M.S. Distributing's audio business, and they began to wrap up the company's affairs (*Id.*, ¶ 19).

### III.

On March 21, 2001, the Court entered a default judgment on Count I against Web Records in the amount of $650,311.79. That amount can no longer be disputed. Similarly, this Court found Ms. Berns liable under Count II on her guaranty of Web's debt in the amount of $438,680.11. That amount can no longer be disputed either; it has been liquidated by the Court. But, the Court left one issue: whether Ms. Berns has meritorious affirmative defenses in the nature of a setoff that will reduce (or eliminate) the $438,680.11 she is liable for on the guaranty.

Ms. Berns' setoff claim includes the two albums produced by Web – "All I Ever Wanted" and "The Vinyl Room" – and the re-release of the Imus album, "This Honky's Nuts" (Pl's. Facts,

¶¶ 35, 56).[3] Ms. Berns is not seeking a setoff for records that Web intended to but did not produce (Def.'s Resp. ¶ 57). The parties agree that because it is Ms. Berns who seeks a setoff, in the nature of an affirmative defense, it is Ms. Berns who has the burden of proof on that claim, even though the pending motion for summary judgment has been filed by the plaintiff, M. S. Distributing. *Central Soya, Co., Inc. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 943-44 (7th Cir. 1982); *see also Anderson*, 477 U.S. at 256. For its part, as the moving party on summary judgment, M.S. Distributing obviously has the burden of showing that there are no genuine issues of material fact with regard to Ms. Berns' setoff defense. But, it is Ms. Berns who must show that she has material evidence that is genuinely disputed that would support a setoff claim. Ms. Berns has failed to satisfy that burden. The Court will therefore enter summary judgment against her in the amount of $438,680.11 on Count II (exclusive of interest, fees and costs), for the reasons explained below.

## A.

The primary argument in support of a setoff by Ms. Berns is that M.S. Distributing was in material breach of the Distributing Agreement prior to Web's demise. Ms. Berns argues that this breach resulted in and/or caused Web to suffer compensatory damages, which Ms. Berns can now assert as a setoff to her liability on the personal guaranty she signed on behalf of Web. Both parties agree that although the Distributing Agreement, which covers goods and services, is controlled by the Uniform Commercial Code ("U.C.C."), Illinois common law principles of material breach apply to the legal claim of breach raised by Ms. Berns (Pl.'s Mem. at 3, 10; Def.'s Mem. at 8). This Court

---

[3]The parties dispute whether Ms. Berns is claiming a setoff for records of single songs (Pl.'s Facts, ¶¶ 56-57). M.S. Distributing claims that Ms. Berns' setoff claim is only for three albums: "All I Ever Wanted;" "The Vinyl Room;" and "This Honkey's Nuts" (Pl.'s Facts, ¶ 56). Ms. Berns, based on her amended interrogatory answers, claims that her setoff claim includes these three albums *plus* single songs (Defs.' Resp., ¶¶ 56-57). Based on the Court's resolution of the setoff issue, discussed *infra*, this dispute is not material.

agrees that Illinois law governs resolution of Ms. Berns' claim and that U.C.C. principles are not inconsistent with that resolution. We will review the relevant legal principles briefly before we apply them to the facts of this case.

Under Illinois law, a party's material breach of contract discharges the other party from a duty to perform under the same contract. *See Quality Components Corp. v. Kel-Keef Enters.*, 738 N.E.2d 524, 537 (Ill. App. Ct. 1st Dist. 2000). Determining whether a breach of contract is material often

> is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in accrual of an unreasonable or unfair advantage.

*Sahadi v. Continental Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir. 1983).

Ms. Berns is alleging that M.S. Distributing breached the Distribution Agreement by repudiation and non-performance. Specifically, Ms. Berns claims that M.S. Distributing breached the Distribution Agreement by doing (or not doing, as the case may be) one or all of the following: (1) M.S. Distributing did not pay the second $250,000 "advance" to Web, when it was requested during the first quarter of 1999; (2) M.S. Distributing did not purchase even half of the required advertising for Web Records' products; (3) M.S. Distributing "failed to solicit record stores to ensure that Web Records' products were available for purchase by consumers throughout the United States even after product shortages were brought to its attention by Web Records"; (4) M.S. Distributing "unilaterally treated the Distribution Agreement as terminated less than one year after signing it; and (5) M.S. Distributing later fired its entire music sales force in October 1999, and liquidated its inventory of records by mid-2000 (Def.'s Mem. at 7).

To establish a material breach of contract, Ms. Berns must show not only the breach of a contractual requirement, but also that she suffered resulting or consequential damages from that breach. *See, e.g., Jackson v. Hammer,* 653 N.E.2d 809, 813 (Ill. App. Ct. 4th Dist. 1995); *Transportation & Transit Assocs., Inc. v. Morrison,* 255 F.3d 397, 401 (7th Cir. 2001). To prove such damages, the injured party must prove a damage amount beyond speculation and with reasonable certainty. *Jackson,* 653 N.E.2d at 814; *see also Kinesoft Development Corp. v. Softbank Holdings, Inc.,* 139 F. Supp. 2d 869, 908-10 (N.D. Ill. 2001).

In Illinois, to prove that damages resulted from a breach, a party cannot rely on evidence of "lost profits" if the business that suffered alleged damage was "new" and had no track record or no measurable comparison group against which damages might be calculated with reasonable certainty. *Kinesoft,* 139 F. Supp.2d at 908-10. This rule is known as the "Illinois new business rule." Under that rule, a new business cannot recover lost profits as damages "because the future profits of a new business cannot be ascertained with any degree of certainty." *Id.* (citing cases). "The reason for the rule is that a new business has yet to show what its profits actually are." *SK Hand Tool Corp. v. Dresser Indus., Inc.,* 672 N.E.2d 341, 348 (Ill. App. Ct. 1st Dist. 1996) (citing *Milex Prods., Inc. v. Alra Labs., Inc.,* 603 N.E.2d 1226, 1236 (Ill. App. Ct. 2d Dist. 1992)). While the Seventh Circuit has questioned the wisdom of this rule, *see Mindgames, Inc. v. Western Publishing Co., Inc.,* 218 F.3d 652, 657 (7th Cir. 2001), this Court has held that the new business rule is viable and enforced by Illinois courts, *see, e.g., Kinesoft,* 139 F. Supp.2d at 908-10, and continues to so hold. In *Mindgames,* the Seventh Circuit applied Arkansas rather than Illinois law. Illinois law quite clearly holds, as do other cases from the Seventh Circuit and this district interpreting Illinois law, that the new business rule applies to bar claims for damages by "a new business, or an existing business with

a new product[.]" *Kinesoft,* 139 F. Supp.2d at 908 (citing cases). Indeed, despite its criticisms of the new business rule in *Mindgames,* the Seventh Circuit has since recognized that the rule exists in Illinois. *Bem I, L.L.C. v. Anthropolgie, Inc.,* 301 F.3d 548, 555 (7th Cir. 2002). Although there are exceptions to this rule, *see Kinesoft,* 139 F. Supp. 2d at 910 (discussing *Milex Products, Inc. v. Alra Labs., Inc.,* 603 N.E.2d 1226 (Ill. App. Ct. 2d Dist. 1992)), none of the exceptions apply in a case like this one where the relevant market is one that does not lend itself to ready accessibility or computation for purposes of damages (*e.g.,* the new recording artists' market where each new singer is his or her own market in terms of success or failure).

Moreover, although Illinois has codified the U.C.C. concept of "best efforts," 810 ILCS 5/2-306, the case law in Illinois generally holds that "[a] 'best efforts' undertaking is similar to the exercise of good faith implied in all contracts." *Coleman v. Madison Two Assocs.,* 718 N.E.2d 668, 673 (Ill. App. Ct. 1st Dist. 2000); *see also Truserv Corp. v. Chaska Building Center, Inc.,* No. 02 C 1018, 2003 WL 924509, * 10 (N.D. Ill., March 30, 2003) (citing *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443-44 (7th Cir. 1992) (even in the absence of a "best efforts" clause, duty of good faith and fair dealing required defendant to act reasonably). This best efforts undertaking, like the duty of good faith and fair dealing, is used as a guide "to determine the intent of the parties;" it does not form the basis for an independent cause of action, *id.,* and is "too indefinite and uncertain to be an enforceable standard." *Penzell v. Taylor,* 579 N.E.2d 956, 961 (Ill. App. Ct. 1st Dist. 1991).

In this case, Ms. Berns asserts that the Illinois new business rule does not apply, but the best efforts obligation does (Def.'s Mem. at 10-11). Both of those assertions are off base.

Although Ms. Berns expressly concedes that she "is not seeking to recover lost profits, or seeking a setoff based on anticipated production runs," she claims that she is entitled to a setoff for all the compensatory damages suffered by Web Records as a result of M.S. Distributing's breach of contract" (Def.'s Mem. at 11). Ms. Berns goes on to argue that M.S. Distributing's "failure to use its best efforts to solicit record stores" and promote Web's products "resulted in lost sales and a corresponding number of returns . . . ." (Def.'s Mem. at 11). Ms. Berns then says that "[a]lthough the exact amount of lost sales (not lost profits) is unknown[,]" she can quantify what was sold and from that figure "reasonabl[y] estimate" lost sales. From those sales, Ms. Berns reaches a damages figure of "more than $450,000" (*Id.*).

The Court finds that Ms. Berns cannot escape the new business rule by the simple expedient of relabeling a "lost profits" claim as a claim for "compensatory damages." Any "compensatory damages" that are based on lost sales from the new Web venture run headlong into the new business rule. There is no dispute that the two albums produced by Web were made by new recording artists who had never before produced a solo album (even though Monty Holmes previously had been a successful songwriter and Patrick "Sleepy" Jones had participated in "a highly successful production team") (Pl.'s Facts ¶¶ 31-34; Def.'s Answers to Fourth Set of Interrogatories ¶ 23). A new recording artist is, by definition, his or her own market; therefore, the "established market" exception to the new business rule recognized in *Milex* does not apply here (*i.e.,* because there can be no comparison to the broader market based on the same product). *See Kinesoft*, 139 F. Supp. 2d at 909-10 (discussing the *Milex* exception). The absence of prior sales by Web and/or its two new artists

actually means that the new business rule applies, the *Milex* exception does not, and Ms. Berns

cannot prove the existence of lost profits, or lost sales that would have generated those profits.[4]

---

[4]Because the Court finds that the Illinois new business rule applies in this case to bar proof of damages by assertions of lost profits, and that the *Milex* exception does not apply, because there is no established market for the product at issue in this case, the issue of whether Ms. Berns can testify as an expert concerning lost sales – which is the subject of a motion to exclude (doc. # 94) – is moot. However, if the *Milex* exception did apply and the issue of Ms. Berns' ability to testify as an expert were material, the Court would grant the motion to exclude. We are not persuaded that Ms. Berns has an expertise that would allow her to opine as to projected sales. Her experience does not deal with calculating expected sales of new labels, and her industry experience preceding the Web venture was dated – she had none for 18 years prior to establishing Web in 1998. And, during that period, the retail aspect of the music business became "much more participated" (*see* Berns Dep. 108-09). Nor does Ms. Berns show that her experience in the rock and roll side of the business is transferrable to the country, hip-hop, or comedy albums she sought to market through Web.

In addition, even were Ms. Berns an expert in projecting sales of these types of records, we are not satisfied that she has a sufficient basis for the opinions she offers. Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *See Clark v. Takata Corp.*, 192 F.3d 750, 759, n. 5 (7th Cir. 1999). "[A]n expert must 'substantiate his opinions'; providing only an ultimate conclusion with no analysis is meaningless." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) (citations omitted). Ms. Berns offers no meaningful statistics, studies, or comparisons to substantiate her opinions about the potential sales of the records in question. Ms. Berns is unable to estimate whether the number of new releases each year is 500 or 10,000 or what percentage of those releases turn a profit because she "do[es not] know what other companies do" (Berns Dep. at 93). And, the reliability of her assertions is further undercut by the discrepancies in the number of potential sales to which Ms. Berns testified in her deposition on October 9, 2002 and in her answer to interrogatories on April 5, 2002. In her April 5, 2002 answers to interrogatories, Ms. Berns wrote that, but for M.S. Distributing's allegedly inadequate distribution, "the combined total [sales] would have exceeded 45,000 copies" (Berns Answer to Fourth Set of Interrogatories at 2). However, in her October 9, 2002 deposition, Mrs. Berns said that the records would have sold between 150,000 and 200,000 records combined (Pl.'s App., Ex. I, at 174). This change is significant, and is not explained by the defendant who bears the burden of proving that his proffered expert witness testimony is reliable.

Nor would Ms. Berns' opinions on lost sales be admissible as lay opinions under Fed. R. Evid. 701. Rule 701 is not a catch-all to permit evidence that is excluded under Rule 702. Moreover, opinions offered in Rule 701 "must be tethered to perception, to what the witnesses saw or heard." *U.S. v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000). In this case, Ms. Berns' opinions of lost sales lacks that basis.

Thus, even in the absence of the new business rule, Ms. Berns' setoff claim would fail because she has failed to muster reliable evidence that would create a triable issue on the amount of lost sales (or profits) that Web allegedly suffered. *See, e.g., Kinesoft*, 139 F.Supp. 2d at 910 (quoting *Wilmette Partners v. Hamel*, 5694 N.E.2d 1177 (Ill. App. 1st Dist. 1992) ("[e]ven without a 'new business' rule, Kinesoft still would be limited to pursuing damages claims that can be 'proved with a reasonable degree of certainty'")); *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 995 (7th Cir. 2002) (a party claiming an injury does not have "carte blanche to provide wild guesses of its damages. A reasonable [damages] estimate . . . must be provided in some record evidence, not numbers pulled from the air").

**2.**

The applicability of the Illinois new business rule defeats Ms. Berns attempt to enforce the

failure of a "best efforts" obligation on M.S. Distributing. Any purported damages flowing from an

asserted failure by M.S. Distributing to exercise best efforts would be tantamount to lost profits

damages, which is barred by the Illinois new business rule. Thus, any disputes the parties have (and

there are quite a few of them) with regard to whether M.S. Distributing used its "best efforts" to sell

Web's products are not material. *See, e.g.,* Def.'s Facts ¶¶ 20-21; 30-51; 63-122; Pl.'s Facts ¶¶ 73,

76-77. Again, these disputes are not material because Ms. Berns cannot satisfy her burden of proof

on damages by pointing to evidence of lost profits which do not comprise a compensable form of

damages because they cannot be calculated with reasonable certainty. Because Ms. Berns must show

that she has facts creating a triable issue on damages to take the breach of contract claim to trial on

her set off claim, she must resort to some other form of damages other than lost profits to satisfy this

burden.[5]

**3.**

Ms. Berns has not pointed to any other evidence of compensable damages to satisfy this

burden. Ms. Berns claims compensatory damages of $300,000 based not on lost sales, but rather that

consists of the $250,000 "advance" that she says she did not receive from M.S. Distributing plus the

sum of $50,000 (presumably the remaining advertising money not used to promote the Monty

Holmes and Sleepy's Theme albums). Ms. Berns' claim that these were funds that Web was

---

[5]The issues of refunds and credits owed to M.S. Distributing (supported by the Declaration of Ron Litwin (Pl.'s App., Ex. G) (doc. # 87), the former controller of M.S. Distributing) are mooted by the Court's rulings on the issue of best efforts and breach, and the issue of *quantum meruit* (Pl.'s Mem. at 8; Pl.'s Reply at 7-8) also is moot given the Court's findings on the merits of Ms. Berns' setoff claim.

wrongfully denied, and thus constitute the loss that Web suffered as result of M.S. Distributing's alleged breach (*e.g.,* failure to make the second advance; unilateral termination of the contract, *etc.*).

Compensatory damages are available when a party engages in anticipatory repudiation and then fails to perform, *Kinesoft,* 139 F. Supp. 2d at 897-99, as Ms. Berns argues was the case here when M.S. Distributing failed to make the second advance, failed to spend the promised amounts on promoting her product, and then indicated its intention not to perform after the meeting between Jackson and Dalesandro in early 1999. But, this damages argument also goes nowhere, because the undisputed facts fail to support this damage claim. For example, Web was not denied the second $250,000 installment of money promised under the contract, because the contract specifically allowed M.S. Distributing to make the $250,000 payment either "as monies due under the Agreement or as an additional Advance." M.S. Distributing argues, and Ms. Berns admits, that M.S. Distributing paid to Web an initial advance of $250,000 in April 1998, and then in August 1998, issued to Web two separate checks, one in the amount of $124,338.07 and the other in the amount of $125,775.00, as payment for invoiced product – which would be "monies due under the Agreement." Ms. Berns admits that these two checks totaled $250,113.07 and were paid as monies due under the contract (Berns' Resp. to Pl.'s First Set of Requests to Admit ¶¶ 1-2). In light of this unrebutted evidence, we find that there is no triable issue as to whether M.S. Distributing made the second $250,000 payment to Web that was required by the Distribution Agreement.

Ms. Berns also admits that M.S. Distributing paid $43,000 and $7,500 in advertising or promotion money for the Monty Holmes and Sleepy's Theme albums, respectively (Def.'s Facts ¶ 62). Under the Distribution Agreement, M.S. Distributing was obligated to pay a minimum of $50,000 to retailers to promote each record, which would amount to a total of $100,000 for those two

records. The Distribution Agreement did not specify a time period in which those payments were to be made. More important, the Distribution Agreement did not require M.S. Distributing to make the payments directly to Web, or to spend the money on promotion or advertising that M.S. Distributing obtained. Rather, the Distribution Agreement put the responsibility on the retailers who would be selling the records to secure the advertising or promotion they wanted; M.S. Distributing's obligation was to reimburse the retailers for the advertising – and then to charge that amount back to Web for repayment.

Although the entire minimum promotional amount was not spent, and this fact is beyond dispute, Ms. Berns offers no evidence that M.S. Distributing failed to reimburse retailers for advertising they placed, or failed to tell advertisers that there were advertising funds available for them to draw upon. In the absence of such evidence, Ms. Berns simply misreads the contract by arguing that M.S. Distributing "did not purchase even half of the required advertising" (Def.'s Mem. at 7), when the agreement only required M.S. Distributing to *reimburse* retailers for advertising *they* purchased, and not to buy advertising that retailers failed to request.[6]

Ms. Berns also argues that M.S. Distributing materially breached the agreement by failing to "solicit record stores to insure that Web Records' products were available for purchase by consumers throughout the United States – even after product shortages were brought to its attention by Web Records" (Def.'s Mem. at 7). This argument fails, at the threshold, to establish a basis for a setoff because Ms. Berns has offered no evidence of damages associated with this alleged breach other than purported "compensatory damages" in the form of lost sales – which, as we have ruled,

---

[6]Ms. Berns does not argue that M.S. Distributing was required to provide reimbursement for advertising for the 25-year old Imus record that was re-released.

22

is barred by the Illinois new business rule and, even were it not, would be too speculative to create a triable issue.

Moreover, we are unpersuaded that Ms. Berns' evidence would create a triable issue as to whether M.S. Distributing's placement of records with retailers fell short of what the Distribution Agreement required. Ms. Berns' argument on this score is inextricably linked with her argument that M.S. Distributing was required to use its "best efforts" to promote the sale of the records: which under Illinois law, is tantamount to saying that M.S. Distributing was required to exercise good faith and fair dealing in promoting record sales. But, the Distribution Agreement did not set any specific thresholds as to the number of stores in which records must be placed, or how many records must be placed in each store. The only evidence that Ms. Berns offers as to the inadequacy of the amounts placed in the stores is Mr. Jackson's testimony that there was more product available to be placed but was not, and a survey offered by Ms. Berns to show that the retail source had insufficient supply of product. As to the latter, Ms. Berns' survey evidence is insufficient to create a factual issue because of the unreliability of the procedures used to obtain the information – there is no evidence showing how it was determined which stores would be contacted, or whether the stores contacted constitute a representative and statistically significant sample; there is no identification of the store employees who responded to the survey; and there was no means of verifying the accounting of the information they provided about the inventory and stock. And, as to the evidence that Web had more records available to be placed, there is no genuine dispute that M.S. Distributing placed about 75 percent of the Sleepy's Theme records in retail outlets and 88 percent of the Monty Holmes records, but that the retailers did not sell all of those that were in inventory. Rather, retailers returned thirty-

five percent of the Sleepy Theme records, and about two-thirds of the Monty Holmes records.[7] Ms. Berns does not offer evidence that would allow a fact finder to infer that the failure of the retailers to sell all the records provided was the result of some action or inaction by M.S. Distributing that breached the Distribution Agreement.

Thus, Ms. Berns has failed to explain how she can create a triable issue on the proposition that M.S. Distributing failed to provide retailers with enough of those records, when the retailers were unable to sell large quantities of those that in fact were provided. And, in any event, Ms. Berns has failed to establish what damages allegedly were suffered by the failure to provide adequate numbers of records, and thus has failed to create a triable issue as to a setoff.

## 4.

Ms. Berns argues that M.S. Distributing committed several other breaches of the contract, each of which she says provides a basis for eliminating any of her obligations under the guarantee, irrespective of her ability to prove damages. Ms. Berns claims that M.S. Distributing improperly treated the contract as terminated less than one year after signing it (Def.'s Mem. at 7), materially altered Ms. Berns' risk by the sale of stock by Messrs. Dalesandro and Salestone in May 1999 (*Id.*, at 12-13), and thereafter fired its music sales force in October 1999 and liquidated its inventory by mid-2000 (*Id.*, at 7). We disagree with Ms. Berns' premise that any of these purported breaches of contract would warrant a setoff in the absence of her ability to prove damages resulting from the breach. Thus, for the reasons stated above, we believe that each of these arguments fails to create

---

[7]We have considered Mr. Berns' Motion to Strike Ron Litwin's Testimony (doc. #87) insofar as it expresses an opinion that retailers were "unable" to sell those records that were returned. However, the plaintiff only seeks to offer the declaration of Mr. Litwin for the purpose of demonstrating that Web's product was sent to stores and that stores returned that product "because the store's customers did not buy those records" (Pl.'s Resp. to Mot. at 1). Because the Court has found that fact already based on other evidence, we deny the motion to strike (doc. #87) as moot – but give no consideration to the Litwin opinion that the motion attacks.

a triable issue of fact. Moreover, even apart from the inability of Ms. Berns to prove damages, we believe that these arguments also fail for additional reasons.

*First*, Ms. Berns has failed to offer proof as to the precise sequence of events concerning M.S. Distributing's actions or inactions in treating the agreement as terminated because of Web's alleged insolvency, and the undisputed facts concerning Web's inability to conduct as a going business concern by, at the latest, mid-June 1999. To the extent that Web's inability to conduct business preceded any termination by M.S. Distributing, there was no breach by M.S. Distributing in terminating the agreement. The "[i]nsolvency of one party must and does excuse performance by the other . . . ." 13 CORBIN ON CONTRACTS, § 1261, at 124 (Interim Ed. 2002) (when insolvency of a party "prevents its rendering of a promised performance . . . that is an express or constructive condition of the other party's contractual duty . . . the actual nonperformance is a discharge of that duty"). *See also Bliss v. California Co-Op Producers*, 181 P.2d 369 (Cal. 1947) (insolvency of one party excused performance of the other party where the insolvent party was unable to perform). Since it is the burden of Ms. Berns to offer summary judgment evidence that would show a triable issue on this point, her failure to offer evidence that shows which event came first (Web's insolvency or M.S. Distributing's treatment of the agreement as terminated) undermines her claim to a setoff based on termination of the agreement.

*Second,* while the evidence establishes that, in May 1999 there was a sale of stock by M.S. Distributing, Ms. Berns has offered no evidence that this sale materially altered the risk of Web or Ms. Berns as a guarantor. There is nothing in the Distribution Agreement that prohibits M.S. Distributing from selling its stock, or that makes such an event a basis for terminating the Distribution Agreement. Correspondingly, there is nothing in the guarantee that relieves Ms. Berns

of her obligations in the event that there was a sale of stock. Accordingly, the mere fact of the sale of stock provides no basis for Ms. Berns to escape her obligations as a guarantor. Moreover, there is no evidence that M.S. Distributing engaged in any conduct that breached the Distribution Agreement during the short interim between the sale of stock in May 1999 and the time when Web made its last payroll and went out of business in mid-June 1999.

Finally, Ms. Berns' argument that Web failed to get the benefit of the Distribution Agreement, because of actions by M.S. Distributing in October 1999 and thereafter, is a non-starter because, by that time, Web already was insolvent.

## CONCLUSION

For the reasons discussed above, Ms. Berns has failed to show a triable issue on her setoff claims that plaintiffs' motion for summary judgment (doc. # 77) is GRANTED against Ms. Berns on Count II in the amount of $438,611.80 (excluding interest, fees and costs), without any setoff to be applied by Ms. Berns. The plaintiffs' motion to exclude (doc. # 94) is denied as moot; and the defendant's motion to strike the declaration of Ron Litwin (doc. # 87) is also denied as moot.

The matter is set for a status conference on May 22, 2003, at 9:00 a.m. to address any remaining issues concerning interest, fees and costs. The parties are directed to discuss settlement prior to the status conference.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: May 12, 2003